## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

PAMELA S. MCKINLEY, as Parent and
Guardian of GM, A Minor Child;
MARGUERITE GARNER,
VALERIE GEORGE, EVAN D. ROBERTS,
SAUNDRA THOMPSON d/b/a Q SHOES,
KRISTINE M. BLACKMAN AND PHILLIP
BLACKMAN d/b/a BLACKMAN
TAEKWONDO ACADEMY, LLC, MESA DE
PLATA LLC d/b/a JALISCO CAFÉ, and
SUSANA VASQUEZ d/b/a PET FOOD
GONE WILD, INC., TRISHA D. KEEFE,
JILL M. INANNA, DAVID G. STEPUTIS,
And JOHN OR JANE DOES 1-100

       Plaintiffs,

v.                                               Case No. 1:20-cv-01331-JHR-JFR

GOVERNOR MICHELLE LUJAN GRISHAM, in
Her Official Capacity as well as Individually;
PUBLIC HEALTH DIRECTOR KATHYLEEN
KUNKEL, INTERIM DIRECTOR BILLY
JIMENEZ, and TRACIE COLLINS, M.D.
Secretary-Designate of NMDOH, Jane and
John Does 1-20,

       Defendants.


**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Defendants Governor Michelle Lujan Grisham and Secretary-Designate Tracie Collins

(collectively, "Defendants"),[1] by and through their counsel of record, hereby submit their motion

---

[1] Kathyleen Kunkel and Billy Jimenez were also named in their official capacities as Secretary and
Acting Secretary of the Department of Health, respectively. *See* Am. Compl. at 1 (caption), ¶ 16.
However, Ms. Kunkel retired last year, and Mr. Jimenez is no longer Acting Secretary of the

to dismiss Plaintiffs' Amended Complaint [Doc. 4] ("Amended Complaint" or "Am. Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As grounds for this motion, Defendants state as follows.

## INTRODUCTION

In March, governors across the nation were forced to issue executive orders impacting every corner of society in an attempt to slow the spread of a deadly, novel virus. Though difficult, these restrictions were (and are) necessary to save millions of lives. Unfortunately, the spread of COVID-19 persists, with significant recent spikes overwhelming New Mexico's hospitals just last month.[2] In responding to this public health emergency, Governor Lujan Grisham—as the top elected executive official of New Mexico—must balance public health considerations with economic harm and social wellbeing. Navigating these competing interests is difficult and fraught with uncertainty. It follows that many New Mexicans may disagree with policy decisions made in response to the pandemic. Those disagreements, however, do not give rise to a justiciable legal dispute, and Plaintiffs may not properly transmogrify policy choices into a federal cause of action—regardless of the amount of irrelevant, speculative, and baseless allegations they may try to fit into their Complaint. Accordingly, for the reasons addressed in detail below, Defendants respectfully request this Court dismiss Plaintiffs' action with prejudice.

---

Department of Health. Accordingly, their successor, Secretary-Designate Collins, is automatically substituted in their place. *See* Fed. R. Civ. P. 25(d).

[2] *See* Robert Nott, *Hospitals in New Mexico are at capacity*, Santa Fe New Mexican (Dec. 7, 2020), https://www.santafenewmexican.com/news/coronavirus/hospitals-in-new-mexico-are-at-capacity/article_e246b2ec-38a3-11eb-ab74-936f76a9a1e9.html. Although rates have thankfully decreased significantly over the past month, the recent discovery of a new, highly contagious variant in New Mexico may lead to another rise in cases. *See Highly contagious COVID-19 variant identified in New Mexico*, KOAT7 Action News (Jan. 19, 2021), https://www.koat.com/article/highly-contagious-covid-19-variant-identified-in-new-mexico/35204847.

## BACKGROUND

**I.     The rapid and dangerous spread of COVID-19 in New Mexico**

Since its emergence only a few months ago, the novel coronavirus disease 2019 ("COVID-19") has spread exponentially across the globe, throughout the United States, and here in New Mexico. The confirmed number of infections in the United States provides a good illustration of this spread. There were just 12 confirmed cases in the United States on February 11, 2020; now, almost one year later, there are more than 25 million confirmed cases and more than 417,000 deaths.[3] Approximately ten months since the first confirmed cases of COVID-19 in New Mexico, there are over 169,696 confirmed cases here and 3,157 related deaths.[4]

COVID-19's rapid spread is attributable to certain characteristics of the virus that causes it and the ease with which that virus is transmitted. COVID-19 is a respiratory illness that causes severe complications in some patients, including pneumonia in both lungs, organ failure, and death. Like most respiratory illnesses, COVID-19 spreads easily through close person-to-person contact, and the risk of transmission increases if individuals interact with more people, come within six feet of one another, and spend longer periods of time together.[5] Although it has not yet

---

[3]   *Previous U.S. COVID-19 Case Data*, Ctr. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/previouscases.html (last visited Jan. 26, 2021); *CCD COVID Data Tracker*, Ctr. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7dayshtml (last visited Jan. 26, 2021).

[4] *2019 Novel Coronavirus Disease (COVID-19)*, N.M. Dep't of Health, https://cv.nmhealth.org/ (last visited Jan. 26, 2021).

[5]   *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (Oct. 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html; *Deciding to Go Out*, Ctr. for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html#:~:text=COVID%2D19%20spreads%20easier%20between,People%20are%20wearing%20masks.

been measured precisely, a significant portion of COVID-19 cases result in mild symptoms or no symptoms.[6] Additionally, even in cases that are symptomatic, the average time from exposure to symptom onset is five to six days, with symptoms sometimes not appearing until as long as thirteen days after infection.[7] This means that individuals who have been infected and have the potential to infect others usually do not know they are infected for at least several days (and may never know, if they remain asymptomatic).

The ease and rapidity with which COVID-19 spreads and its severe and sometimes fatal symptoms in a certain percentage of the population create a potential for mass deaths and a severely overloaded health care system. Because many individuals who have COVID-19 do not know they have been infected, the only effective way to combat the spread of COVID-19 and to mitigate its impacts is to limit person-to-person contact and large gatherings to the greatest extent possible. Although social distancing guidelines generally advise people to stay six or more feet apart, even that degree of distancing does not guarantee that an individual will not contract COVID-19. This means that every foray by a person into a public space with other people carries some risk of transmission, particularly in indoor environments. For instance, a recent study has shown that the act of speaking can emit thousands of potentially infectious droplets which can linger in an enclosed space for between 8 and 14 minutes and greatly increase the risk of transmission within that space.[8]

---

[6] Nathan W. Furukawa et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, Emerging Infections Diseases, Vol. 26, Num. 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[7] *COVID-19 Basics: Symptoms, Spread and Other Essential Information About the New Coronavirus and COVID-19*, Harvard Medical School (March 2020), https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics.

[8] *Id.*

## II.     New Mexico's public health emergency orders

Recognizing the seriousness of this virus and its ability to spread exponentially, the Governor declared a public health emergency under the Public Health Emergency Response Act, NMSA 1978 §§ 12-10A-1 to-19 (2007) and invoked the All Hazards Emergency Management Act, NMSA 1978, §§ 12-10-1 to -10 (1959), as amended through 2007), by directing all cabinets, departments, and agencies to comply with the directives of the declaration and the further instructions of the Department of Health (the Department).[9] Consistent with the powers provided during an emergency under both these Acts, as well as the Public Health Act, NMSA 1978, §§ 24-1-1 to -40 (1973, as amended through 2019), the Secretary subsequently entered a series of public health orders ("PHOs") prohibiting most gatherings of any significant size and curtailing or prohibiting the operations of many businesses.[10] The PHOs' restrictions have varied over time with the prevalence of COVID-19 in New Mexico, with brief periods of heightened restrictions requiring most businesses to operate remotely or by curbside pickup in the spring and November 2020.[11] The current PHO sets restrictions on a county-by-county basis depending on the number of COVID-19 new cases and the average test positivity rate.[12] As relevant to this case, the current PHO prohibits (in "red level" counties) most gatherings of more than five individuals, allows nearly every business (including houses of worship) to operate at up to 25% capacity, and requires

---

[9] Governor Michelle Lujan Grisham, *Executive Order 2020-004* (March 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/03/Executive-Order-2020-004-r.pdf.

[10] *See generally Public Health Orders and Executive Orders*, N.M. Dep't of Health, https://cv.nmhealth.org/public-health-orders-and-executive-orders/ (last visited Oct. 18, 2020) (collecting PHOs and executive orders relating to COVID-19).

[11] *See, e.g.*, N.M. Dep't of Health, *Public Health Order* (Apr. 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/04/04_11_20_PHO_Amended.pdf N.M. Dep't of Health, *Public Health Order* (Nov. 16, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/11/111620-PHO.pdf.

[12] N.M. Dep't of Health, *Public Health Order* at 6 (Dec. 30, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/12/123020-PHO.pdf.

all individuals to "wear a mask or multilayer cloth face covering in public settings except when

eating or drinking" or "[u]nless a healthcare provider instructs otherwise." *Id.* at 10-11.

### III.    Plaintiffs' claims

Against this factual backdrop, Plaintiffs filed the instant action asserting a multitude of

confusing and undeveloped claims. Plaintiffs are nearly a dozen individuals and business entities

that have allegedly been affected by the PHOs in various ways. Plaintiffs' claims essentially fall

into one of four categories: (1) complaints about conduct by non-defendants,[13] (2) complaints

about conduct that is actually permitted by the PHOs,[14] (3) general malaise about the reality of

living through a pandemic,[15] and (4) complaints about clearly constitutional public health

measures.[16] Plaintiffs also broadly (and falsely) assert numerous conspiracy theories against the

---

[13] *See, e.g.*, Am. Compl. at ¶ 14(b) (complaining about being harassed by employees and customers in stores for improperly wearing a mask); *id.* ¶ 14(i) (same); *id.* ¶ 14(c) (claiming doctors have refused to provide her a medical exemption letter despite being qualified for one); *id.* ¶ 14(h) (complaining about citizens reporting her employees and harassing her customers for not wearing masks); *id.* ¶ 14(i) (complaining about separating from husband due to "respective positions on the dangers of COVID-19").

[14] *See, e.g.*, *id.* at ¶ 14(a) (claiming being "deprived of his liberty in the current barren environment created by forced isolation, the shutdown of parks, outside sports, entertainment venues, fitness facilities and restaurants."); *id.* ¶ 14(b) (claiming she has "been deprived of being able to perform her career as a licensed massage therapist"); *id.* (claiming that the church she attends in Albuquerque has been shut down); *id.* ¶ 14(c) (citing health issues arising from wearing mask even though mask orders contain medical exemption); *id.* ¶ 14(i) (same); id. ¶ 14(d) (claiming to have been deprived of being able to practice mixed martial arts); *id.* ¶ 14(f) (claiming not to be able to "move freely in their community and the state").

[15] *See, e.g.*, *id.* at ¶ 14(a) (describing being terrified of putting [their son] into an in-patient program due to COVID-19 and being separated from his parents"); *id.* ¶ 14(b) (describing depression from social isolation); *id.* ¶ 14(e) (claiming to have anxiety due to "change[s] in shopping trends"); *id.* ¶ 14(i) (describing her separation from her husband as a result of their respective positions on the dangers of COVID-19); *id.* ¶ 14(j) (describing "massive depletion of bookings" at her resort as a result of the pandemic and having her "health and wellbeing" affected).

[16] *See, e.g.*, *id.* ¶ 14(f) (claiming being "deprived of their right to a livelihood" as a result of temporary closures and occupancy restrictions on their taekwondo business); *id.* ¶ 14(g) (challenging closures and restrictions imposed on restaurants); *id.* ¶ 14(k) (claiming violation of right to freely travel among the states due to quarantine requirement). Plaintiff McKinley also mentions (but does not subsequently challenge in any of Plaintiffs' ten "counts"). The temporary

seriousness of the pandemic, claiming initial models on COVID-19-related deaths were inaccurate, *id.* at 46-84 COVID-19-related deaths are grossly overinflated, *id.* at 50-57, testing is inaccurate and exaggerates the number of COVID-19 cases, *id.* at 67-84, there is no such thing as asymptomatic spread, *id.* at 84, and masks are ineffective and unhealthy. *Id.* at 92-95. Based on the foregoing, Plaintiffs list ten "counts" seeking declaratory and injunctive relief, as well as damages. *Id.* at 103-20.

## DISCUSSION

### I.      Standard of review

#### A.      Rule 12(b)(1) standard

"Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted). Federal district courts have original jurisdiction over all civil actions arising under the constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 1331. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted). As federal courts are ones with limited jurisdiction, there is a presumption against jurisdiction and the party invoking jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

---

cessation of in-person instruction in public schools which was just recently upheld by the Honorable James O. Browning. See *Hernandez v. Grisham*, No. CIV 20-0942 JB\GBW, 2020 U.S. Dist. LEXIS 238477, at *5 (D.N.M. Dec. 18, 2020) (holding that the State's decision to pause in-person instruction "is facially neutral regarding students with disabilities, and the Plaintiffs have not shown that the Defendants discriminate intentionally against students with disabilities by issuing the Reentry Guidance . . . [and] the Defendants' prohibition on in-person schooling in certain Counties is rationally related to the Defendants' legitimate purpose of preventing the spread of COVID-19, because students, teachers, and staff spread the virus to one another during in-person learning").

Generally, a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) takes one of two forms: a facial attack or a factual attack. *See Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). "[A] facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court "appl[ies] the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action." *Muscogee Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010).

**B.     Rule 12(b)(6) standard**

A Court must dismiss a complaint under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." When examining a complaint under Rule 12(b)(6), the Court must determine "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). In doing so, the Court should "consider the complaint as a whole, along with the documents incorporated by reference into the complaint." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015). The Court may also properly consider facts of which it may take judicial notice, such as its own files and records and those facts which are a matter of public record, such as public health orders. *Id.* at 1185; *see Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB\SCY, 2020 U.S. Dist. LEXIS 122542, at *334 (D.N.M. July 13, 2020) (taking judicial notice of public health orders).

The United States Supreme Court has clarified that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks

and citation omitted). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Rather, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007). "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense" to decide whether any well-pleaded facts have shown any entitlement to relief by "permit[ting] the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679; *see also Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." (emphasis in original)).

## II.      Plaintiffs fail to state a plausible claim for relief

### A.      Plaintiffs lack standing to pursue claims based on conduct of non-parties or those based on generalized grievances

As an initial matter, it should be noted that Plaintiffs cannot seek to hold Defendants liable for the conduct of non-parties and for generalized grievances against the realities of living during a pandemic. Article III of the U.S. Constitution restricts the federal courts to the adjudication of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  "To establish Article III standing, a plaintiff must show that: (1) she has suffered an 'injury in fact' . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). "The principle of causation for constitutional standing requires a plaintiff's

injury to be fairly traceable to the challenged *action of the defendant*, and not the result of the independent action of some third party not before the court." *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) (internal quotation marks and citations omitted). Additionally, to establish redressability, a "plaintiff must also establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

Even a cursory review of Plaintiffs' allegations demonstrates that Plaintiffs' claims largely emanate from the actions of non-parties to this action—for example, customers "harassing" other customers for not wearing masks. *See, e.g.*, Am. Compl. at ¶ 14(h). These claims, which are the result of independent actions of third parties and not likely to be redressed by any favorable decision here must therefore be dismissed.

Plaintiffs' claims must also be dismissed to the extent that they are mere generalized grievances about the hardships of living during a pandemic and being subject to restrictions allegedly based on false information. "[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-74 (1992). Acting in accordance with this principle, federal courts across the nation have properly dismissed similar actions. *See, e.g.*, *Kaetz v. United States*, Civil Action No. 19-cv-08100, 2020 U.S. Dist. LEXIS 235212, at *24 (D.N.J. Dec. 15, 2020) (holding that a plaintiff's "claims that the executive orders violate his rights, including his 'ability to peaceably assemble and to petition the government,' 'his ability be a political activist,' and 'his ability pursue his livelihood' as a carpenter" were insufficient to give him standing to challenge

the New Jersey governor's executive orders); *Baber v. Newsom*, No. 20-5996, 2020 U.S. Dist. LEXIS 184549, 2020 WL 5875018, at *2, 5 (C.D. Cal. July 15, 2020); *Maxwell v. Lee*, No. 20-1093, 2020 U.S. Dist. LEXIS 131012, 2020 WL 5670115, at *2 (W.D. Tenn. June 29, 2020). This Court should do the same.

      **B.**      **The PHOs are valid exercises of authority under state law**

      In "counts" 2, 3, and 9, Plaintiffs seek to have this Court declare that the PHOs are not valid under state law because the "exigencies underlying the Governor's declaration of emergency no longer exists" and enjoin future PHOs "for more than an extremely limited period of time without regular reauthorization by the legislative body." Am. Compl. at 103-106, 118-120. This Court must reject Plaintiffs' attempt to have it trample on state sovereignty.

      The New Mexico Supreme Court has already taken judicial notice of the seriousness of the COVID-19 pandemic in New Mexico and upheld the Secretary of Health's authority to issue and enforce the PHO's under both the PHERA and the PHA as a result of the virus. *See Grisham v. Reeb*, No. S-1-SC-38336, 2020 N.M. LEXIS 37, at *27 (Nov. 5, 2020) ("We have taken judicial notice that the COVID-19 pandemic was an emergency as of March 11, 2020, and continues to be so."). This court is obligated to follow the pronouncements of the New Mexico Supreme Court regarding New Mexico law. *See Romero v. Int'l Harvester Co.*, 979 F.2d 1444, 1449 n.3 (10th Cir. 1992) ("A federal court sitting in diversity and applying state law is obligated to follow the pronouncements of that state's highest court."). And contrary to Plaintiffs' request, the PHERA does not require the legislature to "reauthorize" any declaration of emergency. *See* § 12-10A-5(D) ("A declaration of a state of public health emergency shall be terminated . . . automatically after thirty days, *unless renewed by the governor after consultation with the secretary of health*." (emphasis added)). But most importantly, Plaintiffs' requested relief must be denied because "a

claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).

To be sure, Plaintiffs cite two U.S. Supreme Court decisions pertaining to the ability of courts, in general, to make a factual inquiry as to whether the exigencies that form the basis for an emergency law continue to be present: *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398 (1934) and *Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924). Plaintiffs' reliance is misplaced. First, both were appeals from state court actions (in the case of *Chastleton*, a case filed in the Washington D.C. equivalent of a state court) and were reviewable by the Supreme Court because the emergency question was inextricably part of a federal constitutional challenge. The present case presents the opposite situation: state law claims filed in federal court that are beyond this Court's jurisdiction. There is no free-floating federal constitutional theory upon which Plaintiffs may seek review of whether the State's declaration of an emergency was consistent with New Mexico law. Second, the stated emergency in *Chastleton*—World War I—has already indisputably come to an end, unlike the ongoing pandemic here. *See id.* at 546.[17] Third, *Blaisdell* involved a Contracts Clause claim, which necessarily requires an examination of the facts underlying the change in law. *See Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund*, 343 F.3d 1311, 1321 (10th Cir. 2003). And lastly, Plaintiffs' outlandish claim—based on debunked conspiracy theories—that COVID-19 no longer presents (or ever presented) a basis for emergency measures should be summarily rejected given the universal recognition of its dangers. *See, e.g.*,

---

[17] The ongoing validity of *Chastleton*'s inquiry into the basis for state emergency measures has also been questioned by several courts. *See, e.g.*, *Traweek v. San Francisco*, 659 F. Supp. 1012, 1028 n.30 (N.D. Cal. 1984) ("*Chastleton* is a *Lochner*-era case the validity of which is questionable at best.").

*Roman Catholic Diocese v. Cuomo*, 208 L. Ed. 2d 206, 209 (U.S. 2020) (per curium) ("Stemming the spread of COVID-19 is unquestionably a compelling interest[.]");; *Hernandez*, 2020 U.S. Dist. LEXIS 238477, at *161 n.25 ("The Court disagrees with the Plaintiff's contention that COVID-19 is no longer an emergency, because the number of confirmed cases and deaths have been hitting record highs during the pendency of this litigation."); *Grisham*, 2020 N.M. LEXIS 37, at *27 ("We have taken judicial notice that the COVID-19 pandemic was an emergency as of March 11, 2020, and continues to be so."). Given the foregoing, Plaintiffs' requested relief in "counts" 2, 3, and 9 must fail.

### C.     Rational basis is the proper standard of review for most of Plaintiffs' claims

In "count" 4, Plaintiffs seek to have this Court declare that "the lowest standard of review available under an emergency declaration is intermediate scrutiny." Am. Compl. at 105. As an initial matter, this is not a proper claim for declaratory relief because it does not seek to declare any rights or obligations between the parties. *See Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989) (stating that "[the Declaratory Judgment Act] merely provides a procedure empowering a federal court to declare the legal *rights and obligations* of adversaries engaged in a justiciable controversy" (emphasis added)). But regardless, as the answer to the underlying argument (i.e., which standard of review to apply) impacts the remainder of Plaintiffs' claims, Defendants take this opportunity to address Plaintiffs' contention.

Over one hundred years ago, the Supreme Court declared, "[A] community has the right to protect itself against an epidemic of disease which threatens its members," and judicial scrutiny should be limited to laws that have "no real or substantial relation to" that purpose. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). This principle stands no less true today. Navigating the once-in-a-lifetime health crisis arising from the COVID-19 pandemic necessarily requires difficult

choices, but these tough decisions must be made in order to protect the health and safety of the public. In *South Bay United Pentecostal Church v. Newsom*, a majority of the justices declined to enjoin a California executive order limiting attendance at religious institutions in light of COVID-19. 140 S. Ct. 1613 (2020). Relying on *Jacobson*, Chief Justice Roberts observed, "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38). "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad[,]'" he continued, "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* (quoting *Marshall v. United States*, 414 U. S. 417, 427 (1974) and *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985)).

Most recently, the Supreme Court issued a summary, per curium opinion granting temporary injunctive relief prohibiting enforcement of New York's 10- and 25-person occupancy cap specifically imposed only on houses of worship when many, if not all, secular businesses had no occupancy cap at all in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206, 207 (U.S. 2020). However, in deciding to grant temporary injunctive relief against enforcement of these occupancy caps, the Court did not even come close to casting doubt on the ability of elected officials to restrict certain secular businesses more than others. The main, per curium opinion of the Court does not even mention *Jacobson* or otherwise indicate that Courts should be deferential outside the realm of the First Amendment. *See Roman Catholic Diocese of Brooklyn*, 208 L. Ed.

2d at 207-11. To the contrary, the Court stated, "Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area." *Id.* at 210. And while Justice Gorsuch's solo concurrence takes aim at *Jacobson*'s generally deferential standard—and Chief Justice Roberts' reliance on it in S. *Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020)—even Justice Gorsuch acknowledged that *Jacobson* remains the proper standard when the public health emergency measures do not infringe upon an expressly guaranteed fundamental right. *See Roman Catholic Diocese of Brooklyn*, 208 L. Ed. 2d at 211-12 (Gorsuch, J. concurring) ("Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review . . . . Rational basis review is the test this Court normally applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right.").

Indeed, relying on the above, the Honorable James O. Browning just recently concluded that "*Jacobson* . . . provides the Court with guidance how to apply tiered scrutiny in the public health emergency context[,]" and therefore,

> if there has been no "plain, palpable invasion of rights secured by the fundamental law"—such as discrimination based on a suspect class or violation of a fundamental right under the Constitution—the Court will evaluate whether the law or policy in question has a "real or substantial relation" to the State's public health objectives—in other words, whether the State has a rational basis for the challenged policy.

*Hernandez*, 2020 U.S. Dist. LEXIS 238477, at \*155-56 (D.N.M. Dec. 18, 2020) (quoting *Jacobson*, 197 U.S. at 31).

Plaintiffs' request to apply intermediate scrutiny (or more) to all of their claims simply because the government has "far greater access to information about the emergency than its citizens," and Plaintiffs want this Court to second-guess the factual basis for Defendants' actions

is utterly misguided. Am. Compl. at 107-110. As demonstrated above, Plaintiffs' claim that rational basis should not apply to emergency measures is entirely unsupported by law. *Id.* To the contrary, there is greater need for deference during times of emergency. *See Powers v. Harris*, 379 F.3d 1208, 1218 (10th Cir. 2004) (discussing the importance behind deferential rational basis review and stating "we would paralyze state governments if we undertook a probing review of each of their actions, constantly asking them to 'try again'"); *see also South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring). Accordingly, this Court should reject Plaintiffs' request to ignore centuries of precedent.

> **D.    Basing the State's reopening on testing metrics is a rational policy decision that cannot be second-guessed by this Court or serve as basis for a claim**

Plaintiffs also request for this Court to "enjoin the use of PCR test results as the basis for determining public health responses and restrictions until and unless it is proven by Defendants that this test is reliable and accurate at the cycle thresholds being used in New Mexico." Am. Compl. at 102. Even accepting Plaintiffs' baseless assertions regarding the accuracy of testing as true, however, Defendants' decision to ease restrictions based on certain testing metrics, such as the percentage of positive tests and overall rate of positive cases in each county, is a rational policy choice that cannot be second guessed by this Court. *See Hernandez*, 2020 U.S. Dist. LEXIS 238477, at *185 (agreeing with Defendants that their "decision to suspend in-person learning in counties with higher rates of a deadly virus during an ongoing pandemic is rationally related to a legitimate state interest"); *see also Powers*, 379 F.3d at 1217 (stating that under the rational basis test, "[s]econd-guessing by a court is not allowed"); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125, 128 (6th Cir. 2020) ("Under [rational basis], the Governor's action 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" (quoting *FCC v. Beach Commc'ns, Inc.*,

508 U.S. 307, 315 (1993)). And more importantly, while Plaintiffs may challenge Defendants'
*actions* that purportedly violate their constitutional rights, they cannot use litigation to dictate *how
Defendants' formulate their policy decisions. Cf. Utahns for Better Transp. v. U.S. Dep't of
Transp.*, 180 F. Supp. 2d 1286, 1293 (D. Utah 2001) ("[I]f one disagrees with the policy choices
made, recourse is not to the courts, which can do nothing about policy choices. Recourse, if any,
is to the ballot box."). Their attempt to do so here must be rejected.

### E.      Plaintiffs fail to sufficiently allege a takings claim

In "count" 5, Plaintiffs claim the PHOs' restrictions constitute unconstitutional takings
without just compensation. *See* Am. Compl. at 110-111. They claim this is so because "there is a
lack of any compelling state interest to justify the severe burden imposed on the constitutional
property rights." *Id.* Yet, Plaintiffs do not (as they cannot) cite any authority for the proposition
that the government must have a compelling interest before taking property. And even if there
were such a requirement, "[s]temming the spread of COVID-19 is unquestionably a compelling
interest." *Roman Catholic Diocese*, 208 L. Ed. 2d at 209 (per curium).

Nor is there any specific allegations from which this Court may conclude a taking has
occurred as a result of the PHOs. While paragraph 138 incorporates all other preceding paragraphs,
only Plaintiff Saundra Thompson alleges that the PHOs' restrictions constituted a takings. *See* Am.
Compl. at ¶ 14(e). Specifically, she asserts a conclusory legal assertion that the designation of her
business as "non-essential"[18] gives rise to a takings claim. *Id.* But nowhere in the Amended
Complaint do Plaintiffs explain how such a designation would constitute a taking. This is
insufficient to properly state a takings claim. "To state a taking claim, it is not enough to allege

---

[18] The vast majority of "non-essential" businesses, such as Plaintiffs', have been permitted to
operate in-person in some capacity throughout most of the pandemic. *See Public Health Orders
and Executive Orders*, *supra* note 10.

17

that government conduct frustrated a business enterprise. Takings jurisprudence is directed at government conduct that denies beneficial use of *property*, meaning things like legal interests in real or personal property, not the liberty interest to engage in business activity." *Savage v. Mills*, No. 1:20-cv-00165-LEW, 2020 U.S. Dist. LEXIS 141628, at *24 (D. Me. Aug. 7, 2020) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). Accordingly, courts have dismissed actions based on similar conclusory allegations based on temporary restrictions of business operations during the pandemic. *See, e.g.*, *id.* ("Presumably, [the plaintiffs] were unable to sell products and services for a time, but [they] have not cited any authority stating that the inability to sell goods and services is a taking of their property. They have failed to state a takings claim."); *Antietam Battlefield KOA v. Hogan*, Civil Action No. CCB-20-1130, 2020 U.S. Dist. LEXIS 215250, at *15 (D. Md. Nov. 18, 2020) ("The plaintiffs make no concrete allegations that personal property associated with their business was effectively taken from them. Nor have they demonstrated that the inability to sell goods and provide services for a limited period of time can, as a matter of law, constitute a taking of their property.").

F.  **The PHOs' occupancy and mask requirements as applied to houses of worship are constitutional because they are neutral, generally applicable, and rationally related to stemming COVID-19**

Plaintiffs also challenge the PHOs' occupancy restrictions and mask requirements as they apply to houses of worship. Am. Compl. at 112.[19] The only plaintiffs who have alleged any infringement of their free exercise rights are Valerie George and Marguerite Garner. *Id.* ¶ 14(b)-

---

[19] Plaintiffs also allege that "[c]hurches are required to enforce social distancing, when there is no evidence that social distancing is effective at reducing the spread of this disease." *Id.* But they do not explain specify what social distancing requirements of which they complain nor do they specify how any such requirements impairs their ability to practice their sincerely held religious beliefs.

(c). George alleges the church she attends was "shut down except for remote participation[,]" *id.* ¶ 14(b),[20] and both allege that the statewide mask mandate prevents them from exercising their religious beliefs. *Id.* ¶ 14(b)-(c). However, neither allege that the *current* occupancy restrictions—which have been in place for months—prevent them from attending church to exercise their faith. *See id.* Accordingly, they do not have standing to challenge the occupancy restrictions. *See Delaney v. Baker*, No. 20-11154-WGY, 2021 U.S. Dist. LEXIS 1567, at *27 (D. Mass. Jan. 6, 2021) (holding that a parishioner lacked standing to challenge the Massachusetts governor's occupancy restriction on houses of worship because he did not allege that they actually operated to exclude him from attending church). Furthermore, the PHOs' occupancy restrictions currently imposed on houses of worship have already been upheld by the Honorable James O. Browning because they are neutral, generally applicable, and rationally relate to stemming the spread of COVID-19. *See Legacy Church*, 2020 U.S. Dist. LEXIS 122542 (upholding 25% capacity restriction).[21]

---

[20] George's allegation that her "shut down except for remote participation[,]" is apparently in reference to an April 11, 2020 PHO that temporarily closed most businesses, included houses of worship, for in-person activities. *See* N.M. Dep't of Health, *Public Health Order*, at 5 (April 11, 2020), https://cv.nmhealth.org/wp-content/uploads/2020/04/04_11_20_PHO_Amended. pdf. However, that temporary suspension of in-person attendance has already been upheld, *see Legacy Church, Inc.*, 2020 U.S. Dist. LEXIS 122542, at *342-52, and houses of worship have been permitted to operate at 25% capacity or more since April 30. *See generally Public Health Orders and Executive Orders*, *supra* note 10.

[21] *Roman Catholic Diocese of Brooklyn* does not command a different result with regard to the current occupancy restrictions because they do not employ any hard cap as involved in that case, and they treat houses of worship the same as essential retail locations like grocery stores. *See* N.M. Dep't of Health, *supra* note 12; *S. Bay United Pentecostal Church v. Newsom*, No. 20-56358, 2021 U.S. App. LEXIS 1854, at **43-47, 50-53 (9th Cir. Jan. 22, 2021) (upholding percentage capacity restrictions on houses of worship and enjoining only the 100-and 200-person caps on houses of worship because retail and grocery stores did not have such a cap); *Calvary Chapel Lone Mt. v. Sisolak*, No. 20-16274, 2020 U.S. App. LEXIS 39295, at *2-3 (9th Cir. Dec. 15, 2020) (remanding for district court in light of *Roman Catholic Diocese of Brooklyn* to apply strict scrutiny to Nevada's occupancy restriction limiting attendance at houses of worship "to the lesser of 25% of the listed fire code capacity or 50 persons" and "to preliminarily enjoin the State from imposing

Similarly, the mask requirement does not run afoul of the First Amendment because it is a neutral law of general applicability, and it is rationally related to a legitimate state interest in stopping the spread of a deadly, airborne virus.[22] *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993). The PHOs require "all individuals [to] wear a mask or multilayer cloth face covering in public settings except when eating or drinking" unless a healthcare provider instructs otherwise. *See* N.M. Dep't of Health, *supra* note 12 at 11. Courts across the nation have upheld such requirements against Free Exercise challenges given their neutrality, general applicability, and rational relation to stemming the spread of COVID-19. *See, e.g.*, *Delaney*, 2021 U.S. Dist. LEXIS 1567, at *37 (rejecting Free Exercise challenge to requirement that "[a]ll persons in Massachusetts over the age of five years old are required to wear a mask or cloth face covering over their mouth and nose when in a public location, whether indoors [or] outdoors"). Nor do Plaintiffs explain how the mask requirement actually burdens their ability to practice their religious beliefs when they can wear a clear face shield-type mask, which would alleviate their alleged injuries surrounding the mask requirement (i.e., being unable to "sing[] freely or for shared emotions in worship by seeing your fellow worshippers' faces and being able to embrace them"). Am. Compl. at 112; *cf. Young v. Becksted*, No. 20-cv-1080-LM, 2020 U.S.

---

attendance limitations on in-person services in houses of worship that are *less favorable than 25% of the fire-code capacity* [imposed on most other commercial entities]" (emphasis added)).

[22] The general consensus of the medical community is that masks are effective in reducing the spread of the virus that causes COVID-19. *See, e.g.*, *Scientific Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctr. for Disease Control and Prevention (Nov. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/more/masking-science-sars-cov2.html. Plaintiffs' conspiracies about the effectiveness of masks does not negate this. *See Powers*, 379 F.3d at 1217 (10th Cir. 2004) (stating that courts "will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish or . . . . on the basis that no empirical evidence supports the assumptions underlying the legislative choice" (citations omitted)).

Dist. LEXIS 226374, at *7 (D.N.H. Nov. 10, 2020) ("[T]here is no constitutional right to be seen smiling while talking, and [i]f there was, [the plaintiff] could wear a transparent face shield[.]" (internal quotation marks and citation omitted)). For these reasons, Plaintiffs' Free Exercise claims must fail.

### G. The mass gathering restriction does not violate the right of association because no expressive association is at issue

Plaintiffs' "Count 7" requests that the Court declare that the mass gatherings limit violates the right of association under the First Amendment. Am. Compl. at 112-13. The First Amendment protects associational rights in two distinct ways. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). It "protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships;" (i.e., intimate association) and it ensures "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities" (i.e., expressive association). *Bd. of Dirs. v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987) (citing *Roberts,* 468 U.S. at 617-18). "Of course, the right of association is no more absolute than the right of free speech or any other right; consequently there may be countervailing principles that prevail over the right of association."  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006) (quotations omitted).

However, the Court need not reach this analysis, as Plaintiffs fail to plead any plausible association that could be protected under the First Amendment. Plaintiffs' Amended Complaint is devoid of any allegations that an association at issue is protected by the right of intimate association. *See* Am. Compl. at 12, 14, 112-13; *Roberts*, 468 U.S. at 619-20 (recognizing that relationships that exemplify constitutionally protected intimate associations "are those that attend the creation and sustenance of a family" such as marriage and include relationships characterized by "relative smallness, a high degree of selectivity in decisions . . . and seclusion from others in

critical aspects of the relationship"). Plaintiffs have similarly failed to allege any expressive association is prohibited or prevented by the PHOs. "[C]ourts only 'recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment speech, assembly, petition for the redress of grievances, and the exercise of religion." *A.M. v. N.M. Dep't of Health*, 117 F. Supp. 3d 1220, 1257 (D.N.M. July 17, 2015) (quoting Roberts, 68 U.S. at 618). Here, Plaintiffs merely state that the mass gathering restriction abridges the right of association and that the "mass gathering prohibition has had a serious effect on political speech as it interfered with political organizing, rallies and meetings leading up to the recent elections." Am. Compl. at 112-13. But the Amended Complaint is silent as to *how* any of the individual Plaintiffs have been prevented from engaging in *expressive* association.

"Expressive association is the 'right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" Legacy Church, Inc., 2020 U.S. Dist. LEXIS 122542, at *221 (D.N.M. July 13, 2020) (quoting *Schalk v. Gallemore*, 906 F.2d 491, 498 (10th Cir. 1990)). While "[t]he First Amendment's protections of expressive association is not reserved for advocacy groups," in order to "come within its ambit, a group must engage in some form of expression whether it public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Because none of Plaintiffs allege that the PHOs restricted their ability to associate for an expressive purpose, they have failed to state a plausible claim. [23] *See A.M.,* 117 F. Supp. 3d at 1257-60; *see also Taylor*

---

[23] While Plaintiffs pepper in various allegations regarding associating with others, none of these implicate expressive association. Plaintiff G.M.'s claim that he has been deprived of his right to peaceful assemble with other students at his school and in extracurricular activities fails, as attending school is not expressive conduct. *See* Amend. Compl. at 12; *Peterson v. Kunkel*, No. 1:20-cv-00898-WJ-CG, 2020 U.S. Dist. LEXIS 183471, at *26-28 (D.N.M. Oct. 2, 2020) (holding that a student's desire to associate with her classmates to obtain an education did not implicate expressive conduct or association). Plaintiff Garner similarly has no viable right of association

*v. Grisham*, No. 1:20-cv-00267-JB-JHR, 2020 U.S. Dist. LEXIS 105960, at *10-13 (D.N.M. June 16, 2020) (ruling that a right of association claim was unlikely to succeed due to the plaintiff's failure to demonstrate how the executive orders issued in response to COVID-19 infringed on his religious practices); *cf. Stanglin*, 490 U.S. at 25 (ruling that dance hall patrons could not establish they were entitled to First Amendment protection because there was no suggestion "that [they] [took] positions on public questions"). Thus, Plaintiffs' threadbare right of association claim is legally deficient because there is no "generalized [First Amendment] right of 'social association.'" *A.M.*, 117 F. Supp. 3d at 1259 (quoting *Stanglin*, 490 U.S. at 25).

**H.    Plaintiffs' claims mentioned in "count" 8 are undeveloped and fail on the merits**

As an initial matter, the Court should not reach the merits of Plaintiffs' constitutional arguments asserted in "count 8." Plaintiffs themselves admit these purported constitutional violations are "not discussed elsewhere in the complaint" but instead "welcome the opportunity to fully brief the Court more fully on these issues." Am. Compl. at 113. Plaintiffs' failure to meet the pleading standard required by *Iqbal* is fatal to these claims. *See Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Nonetheless, Defendants endeavor to address the underlying merits should this Court determine otherwise.

---

claim, as her alleged deprivation of "social interaction" due to the closure of "Senior Citizen Centers" is not protected by the First Amendment. Amend. Compl. at 12; *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (holding a generalized First Amendment right to social association does not exist). Further, to the extent that Plaintiff Garner's ambiguous allegations could be interpreted as alleging a violation of her right to association in regards to being able to physical congregate at her church, houses of worship have been permitted to operate at 25% or more occupancy since April, and the 25% occupancy limit has already been upheld as not violating freedom of association. *See Legacy Church*, 2020 U.S. Dist. LEXIS 122542, at **383-86).

### 1.      Right to Interstate Travel

Plaintiffs claim their right to interstate travel is violated by the provision of the Governor's Executive Order 2020-075 directing persons arriving from states meeting a specific test positivity rate or a positive test rate quarantine for 14 days fails as a matter of law.[24] Am. Compl. at 113-14. The Fourteenth Amendment's Privileges or Immunities Clause creates a "constitutional right to travel from one State to another." *Saenz v. Roe*, 526 U.S. 489, 498 (1999). This right embraces three different components: (1) the right of a citizen of one state to enter and leave another state; (2) the right to be treated "as a welcome visitor" when temporarily present in another state; and (3) the right for travelers who elect to become residents to be treated like other residents of that state. *Id.* at 500. The Supreme Court has made is clear that the right to interstate is not unlimited. "Although citizens have a right to travel throughout the United States 'uninhibited by statutes, rules, or regulations which *unreasonably* burden or restrict movement, reasonable restrictions on the right to interstate travel are permissible.'" *Abdi v. Wray*, 942 F.3d 1019, 1029-30 (10th Cir. 2019) (quoting *Saenz*, 526 U.S. at 499 (emphasis in original)). "In sum, government conduct that does not directly and substantially 'impair the exercise of the right to free interstate movement' does not amount to a constitutional violation." *Id.* at 1030 (quoting *Saenz*, 526 U.S. at 501).

Executive Order 2020-075 does not violate the right to travel. First, the Order does not prohibit travel into or out of New Mexico. *See* Executive Order 2020-075, *supra* note 23. While a quarantine requirement may deter travel because individuals, like Plaintiff David Steputis, do not wish to follow the Order, this does not burden the right to travel sufficient to invoke strict scrutiny. *See Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009) ("But not everything that deters

---

[24] Governor Michelle Lujan Grisham, *Executive Order 2020-075* (Oct. 29, 2020), https://www.governor.state.nm.us/wp-content/uploads/2020/10/EO-2020-075.pdf [hereinafter Executive Order 2020-075].

travel burdens the fundamental right to travel."). Indeed, a similar 14-day quarantine requirement for persons entering the State of Hawaii did not violate the right to interstate travel. *See Carmichael v. Ige*, No. 20-00273 JAO-WRP, 2020 U.S. Dist. LEXIS 116860, at \*22-25 (D. Haw. July 2, 2020). Second, the Amended Complaint contains no allegations regarding any differential treatment of non-residents that would implicate any interest recognized in *Saenz*.[25] Therefore, Plaintiffs' claim regarding the right to travel fails as a matter of law.

### 2.   Second Amendment

Plaintiffs assert that the PHOs' failure to designate gun stores constitutes a violation of the Second Amendment. *See* Am. Compl. at 115. Yet nowhere in the Amended Complaint do Plaintiffs allege owning such a store or even being prohibited from purchasing a firearm as a result of the PHOs. *See generally id.* Accordingly, Plaintiffs fail to demonstrate standing to make a Second Amendment challenge, *see Lujan*, 504 U.S. at 573-74, nor do they demonstrate how the PHOs failure to designate gun stores as essential "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (internal quotation marks and citation omitted)).

### 3.   "Right to Work"

Plaintiffs also allege the PHOs' temporary occupancy restrictions on certain various businesses throughout the pandemic violate a purported "right to work." Am. Compl. at 115-16. It is well established that "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes." *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005); *see also Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012) (holding that a right to

---

[25] Nor is there a non-resident plaintiff who would have standing to raise such a challenge. *See generally* Am. Compl.

practice in one's chosen profession is not fundamental). Thus, federal courts have repeatedly rejected due process challenges to COVID-19 restrictions on the basis that there is no fundamental right to operate a business, and business closures/restrictions were rationally related to a legitimate government interest in stemming the spread of the virus. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc.*, 814 Fed. Appx. at 127-130; *Xponential Fitness v. Arizona*, No. 20-01310, 2020 U.S. Dist. LEXIS 123379 at *16 (D. Ariz. July 14, 2020); *Talleywhacker, Inc. v. Cooper*, No. 20-218, 2020 U.S. Dist. LEXIS 99905 at **25-26 (E.D.N.C. June 8, 2020).[26]

And while Plaintiffs' assert the PHOs' restrictions on their businesses are "without a doubt, arbitrary and capricious," Am. Compl. at 117, they fail to explain why that is. Plaintiffs' claim therefore fails. *See Bd. of Trs. v. Garrett*, 531 U.S. 356, 367 (2001) (stating that "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the [law]" (internal quotation marks and citation omitted)); *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## I. Plaintiffs' claims for damages are barred by sovereign and qualified immunity

Given Plaintiffs' failures to state any valid claim for relief, Plaintiffs' final "count" requesting damages necessarily fails as well. Yet even if Plaintiffs *did* assert a valid claim against Defendants, their request for damages would fail as a matter of law. With the exception of

---

[26] Plaintiffs cite the one district court that has held otherwise, *Cty. of Butler v. Wolf*, Civil Action No. 2:20-cv-677, 2020 U.S. Dist. LEXIS 167544, at *1 (W.D. Pa. Sep. 14, 2020), but the decision has been stayed pending appeal (which will almost certainly result in reversal). *See Cty. of Butler v. Governor of Pa.*, No. 20-2936, 2020 U.S. App. LEXIS 31632, at *2 (3d Cir. Oct. 1, 2020); *see also Lewis v. Walz*, No. 20-1212 (DWF/HB), 2020 U.S. Dist. LEXIS 179832, at *10 n.5 (D. Minn. Sep. 30, 2020) (declining to rely on *Wolf* and noting that "the majority of courts across the country have relied on *Jacobson*'s framework to analyze emergency public health measures enacted to combat the spread of COVID-19"). This Court should decline Plaintiffs' invitation to follow a single district court in another circuit whose decision is likely to be reversed.

Governor Lujan Grisham, Plaintiffs are suing Defendants solely in their official capacities. *See* Am. Compl. at ¶ 16. Plaintiffs' claims for damages against those Defendants are therefore barred by sovereign immunity. *See Peterson*, 707 F.3d at 1205 ("[B]ecause an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity, the Eleventh Amendment provides immunity when [s]tate officials are sued for damages in their official capacity." (internal quotation marks and citation omitted)).

Further, Plaintiffs' claims against Governor Lujan Grisham are barred by qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . Ordinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (internal quotation marks and citations omitted). Plaintiffs cannot credibly claim that the Governor Lujan Grisham violated any clearly established rights when Defendants took action to protect New Mexicans in the midst of a rapidly spreading, unprecedented pandemic—actions which, as discussed above, courts have upheld repeatedly over the past few months. Accordingly, Plaintiffs' claim for damages fails regardless of the merits underlying their claims.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' claims with prejudice.

Respectfully submitted,

_s/ Holly Agajanian_
Holly Agajanian
*Chief General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
Holly.Agajanian@state.nm.us
505-476-2210

Kyle P. Duffy
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
kyle.duffy@state.nm.us
505-476-2210

Maria S. Dudley
*Associate General Counsel to*
*Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
maria.dudley@state.nm.us
505-476-2210

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2021, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*s/ Holly Agajanian*
Holly Agajanian